TONI MESSINA, ESQ.
100 Lafayette Street, Suite 502
New York, NY 10013

December 5, 2012

Hon. Thomas P. Griesa
United States District Judge
500 Pearl Street
New York, New York 10007

PRE-SENTENCE SUBMISSION

Re: United States v. *Johnny Nunez- Garcia*
10 Cr. 367 (TPG)

Dear Judge Griesa,

My client, Johnny Nunez-Garcia ("Johnny") was tried before you on January 17th 2012, and convicted of the crimes of conspiracy to traffic in narcotics (crack/cocaine) and weapons possession in furtherance of that conspiracy.

I am submitting this letter arguing law, facts and mitigation to assist you in determining what sentence should be imposed that tempers punishment with mercy, and to detail all the mitigating events of my client's history.

He was young when he committed these crimes—a teenager. His childhood was marred by poverty, lack of parental care, and he had serious, untreated cognitive deficits that impacted his development and maturity. Finally, when he came to this country, he was placed with a father he barely knew who believed physical punishment was the only way to instill obedience.

Already, the mandatory minimum sentence in this case is stiff—10 years based on the quantity of narcotics sold; and either five, seven or ten years consecutive for the weapons conviction depending on whether Your Honor finds Johnny "possessed," "brandished," or "discharged" a weapon in furtherance of the drug conspiracy.

A further complication is that Johnny has already been sentenced to a five-year State jail term for possessing the same weapons involved in this conspiracy. Because he was arrested first by the State, the Bureau of Prisons ("BOP") will not credit his time in state- court incarceration, or the time he's been in federal prison on "loan" from the State to face these charges.[1]  While Your Honor can impose this sentence prospectively to run concurrent with Johnny's un-discharged State term, two years of Johnny's State time for the same weapons will not be credited to this case.

Counsel asks Your Honor consider the above arguments in determining the appropriate sentence.

While Johnny must serve a 10-year minimum mandatory sentence because of the quantity of drugs the jury found he participated in selling, it is the Court that must determine how much time he must serve for the 924(c) conviction.

Counsel urges the court find that Johnny neither brandished (seven-year sentence) or discharged (10-year sentence) a gun in furtherance of the conspiracy, and impose a consecutive sentence of five years for that count.

# I. The Government Did Not Prove Johnny Brandished or Discharged a Weapon in Furtherance of the Conspiracy

**Overview:**

This case involved a multi-defendant, alleged drug-gang which controlled a particular part of 1151 Elder Avenue, Bronx. The leader of the gang, Javier Lopez (aka Twin), worked with Johnny Garcia and others to sell crack-cocaine. Twin was widely known as the head of the group and according to testimony, bagged and distributed drugs; organized work schedules, collected money and parsed out earnings. He also ordered the 'hit' against Christopher Torres (a

---

[1] Michael Tafelski, Regional Counsel, BOP, Northeast Region

cooperating witness), which was carried out by a different cooperating witness, Kelvin Vasquez. (Twin pleaded guilty and is yet to be sentenced.)

The bulk of the testimony at trial came from three cooperating witnesses:  Kelvin Vasquez (aka Cacaito), Christopher Torres (aka Jon Jon), and Eddie Velez.  Each belonged to a different drug gang, had long criminal histories and multiple prior acts of violence. Each benefitted from 5K letters written by the government.

Witnesses testified to four major incidents during which Johnny allegedly brandished or fired a weapon.  It is counsel's position that either there was insufficient corroboration to believe these incidents occurred, or if they did, they did not occur *in furtherance* of the crime of narcotics trafficking.

1) Johnny fired a weapon toward a group of women outside 1151 Elder in December, 2009, because the women, by loudly arguing, were "heating up the spot." [Transcript("Tr") p. 83, 7-11].

2) Johnny allegedly accompanied co-defendant, Mario Carrera, to the back of the Elder building when Sean Daniels (referred to in testimony as the 'gay guy') was shot by Carrera.

3) Johnny allegedly shot toward Christopher Torres while walking down Wheeler Ave. in the Summer of 2009.

4) Johnny and Twin fired weapons from the roof of 1151 Elder on New Year's Eve.

Counsel will examine each incident in turn.

1) Firing a Weapon Toward a Group of Women

According to Kelvin Vasquez, a group of women entered 1151 Elder in December, 2009, and began arguing with defendant and others in the apartment.  After insisting they leave, the argument spilled into the street. Garcia allegedly fired a weapon causing a bullet to graze the leg

of Natalie Santana.  Police investigated; Johnny was arrested, but charges were later dropped, (allegedly by Johnny's prompting). Santana suffered a minimal flesh wound.

Although Vasquez testified that Johnny told him he shot at the girls because they were "heating up the spot," Detective Rodney Goulding, the supervising officer at the scene, stated at trial that he did not believe the encounter to have *had anything* to do with narcotics activity. (Tr. 211.)  Goulding knew the area well and the group.  Part of his job was to investigate alleged narcotics activities. Certainly, if he believed the shooting had anything to do with narcotics trafficking, he would have said so at trial.

Goulding is a far more credible witness that Vasquez, a cooperator, who never told prosecutors the motive for the shooting involved drugs until deep into his proffer sessions, just before he pleaded guilty knowing he would be testifying against Johnny.  (Tr.144-145, 21 et seq.)

Furthermore, it's simply illogical that someone worried about making the "spot hot" – or interested in keeping police away from the building-- would fire shots, thus more quickly drawing police attention.  A more reasonable conclusion, equally supported by the evidence, is that Garcia fired the weapon, not in furtherance of any drug conspiracy, but as an impulsive act of anger.

2) <u>Accompanying Mario Carrera during the shooting of Sean Daniels</u>

Sean Daniels, ("the gay guy"), was shot on at 1160 Wheeler, in February, 2010.  It's the government's position that Daniels was shot because he lived in the building behind 1151 Elder, where rival drug sold drugs.  According to testimony, the shooting appears to have been a purposeful act, aimed particularly at Daniels (unlike the random shootings testified to, such as Twin randomly shooting out the back bathroom window.)

It is interesting to note that the victim, Sean Daniels, was referred to only as "the gay guy," at trial and that according to prosecution witnesses, he had nothing to do with the drug activity on the block.  No evidence was presented to connect this shooting to drug activity.

Because Daniels was not part of any drug war and because this shooting was arguably not random, it's merely conjecture that the Daniels' shooting had anything to do with drug trafficking.  The shooting could have been, just as logically, for reasons unrelated to drugs.  Without condoning any of the reasons that might have caused the shooting, it could have just as reasonably been based on gay bashing, which may explain why Daniels was only known and referred to by neighborhood drug dealers (Vasquez, Torres, and Valez) as the "gay guy."

Because the evidence is insufficient to conclude the shooting occurred in furtherance of the drug conspiracy, it should not be used to enhance Johnny's sentence.

In U.S. v. Munoz, 143 F.3rd 632 (1998, 2nd Cir.) the Court stated that the "[u]se of a firearm 'in relation to' a drug trafficking crime requires the government demonstrate a nexus between the firearm and the underlying drug trafficking crime." *United States v. Melendez,* 60 F.3d 41, 46 (2d Cir. 1995), *citing Smith v. United States,* 508 U.S. 223, 237-38, 113 S. Ct. 2050, 2058-59, 124 L.Ed.2d 138 (1993). The firearm must have "some purpose or effect with respect to the drug trafficking crime." *Smith,* 508 U.S. at 238, 113 S. Ct. at 2059.

In this instance, the Government has proven no such nexus.

Furthermore, counsel challenges whether enough evidence was presented to conclude that Johnny had anything to do with the shooting at all. Eddie Velez put Johnny at the scene, allegedly standing on a rooftop after the shots were fired.  Yet Velez, when asked by police on the night of the shooting if he saw anyone he recognized, said he *did not.* (Tr. 439, 2-6).  The

alleged recognition of Johnny came only after Velez knew he would be cooperating against Johnny.

Even if credited that Velez identified Johnny not purely out of self-interest, but believing it to have been Johnny (putting aside the fact that he failed to report that to police), the reliability of the identification must be challenged. The events occurred quickly in the dimness of backyard lighting (Tr. 436, 6-9), with Velez scared for the safety of his wife and child. All of these factors—quickness of event, fear, and minimal lighting—play major roles in undermining the accuracy of identifications.[2]

3. Shooting Towards Christopher Torres

Christopher Torres contends that Johnny shot toward him in the Summer of 2009 near the corner of Wheeler and Westchester. On another occasion he said he saw or heard about Johnny and Carlos Carrera running up Wheeler shooting guns. There is no independent corroboration of these events.

Torres didn't know Johnny well. Torres was a member of the Wheeler Boys drug-gang, a rival, drug gang that worked near Elder. He had little connection with events relating to Johnny's trial except to provide general background about the gangs in the area and testify about the above-mentioned gun discharge, as well as his own shooting which occurred after Johnny was in jail and thus no longer part of the conspiracy.

Torres' testimony must be challenged based on his bias (self-interest in producing information against Johnny so that he would be called to testify); and on his ability to relate and recall events accurately.

---

[2] While Kelvin Vasquez testified that Johnny bragged to him that he accompanied Mario Carrera when Carrera shot Daniels, first, this information was not provided till late in proffer sessions; second, Vasquez's credibility must be strictly scrutinized because of his own criminal history and prior acts of dishonesty—such as lying to parole officers about his own continuing criminal acts when he was obliged to commit no new crimes. Finally, even if believed, it was Mario Carrera who shot Daniels and not Johnny.

Torres testified that he knew Twin (the leader of the Elder gang) well.  He had seen him

dozens of times, but was less familiar with Johnny.  [He'd only seen him a total of five times.

(Tr. 283, 6-9).]  In describing events which led to his own shooting in February, 2010, he told

police he was sure he was shot by Twin—a face he'd easily recognize.  Yet, Torres was wrong!

Vasquez admitted on the stand that it was he who shot Torres, not Twin.  Nonetheless, Torres

told police he was certain it was Twin.

Stipulation (p. 585): "If called to testify, NYPD Det. Cliff Acosta would testify that on Feb. 26[th],
2010, he interviewed Torres at the 43[rd] Pct. and that Torres told Det. Acosta the following:
**"While in the hallway, Torres heard a knock at the door. As Torres got closer, he saw that
it was *Twin* from Elder. Torres then saw *Twin* put a revolver to the glass and start
shooting. Torres knew *Twin* from Elder and had seen him approximately 15 to 20 times in
the last two months."**

Through this mistake, it's clear that Torres either has poor capabilities of accurately recalling

events, or that he is easily misled by what he hears from others, (thus the long questioning about

this during cross-examination), and assumes "word on the street" is true and adopts it as his own.

Torres' testimony that he is sure he saw Johnny shooting down Wheeler is also suspect.

Without further corroboration, police reports, or witnesses, and specifically with the lessoned

exposure Torres had to Johnny (he saw him only five times in his life, Tr. 283, 6-9), and the

suspect nature of his own ability to accurately recall faces,  the government has failed to prove it

was Johnny who discharged a weapon that night.  None of these events was ever reported to

police.

4. <u>Johnny and Twin fired weapons from the roof of 1151 Elder on New Year's Eve.</u>

Testimony was offered that on December 31, 2009, Johnny and Twin fired weapons from the

roof of 1151 Elder.  No testimony was offered to link the discharge of these firearms to anything

other than a New Year's Eve celebration.  In fact, according to their own witness, Kelvin

Vasquez: "That day they fire[d] shots because it was the arrival of the New Year." (Tr.137, 13-16.)

**Conclusion:**

It is the government's obligation to provide credible evidence that weapons were either brandished or discharged by Johnny Garcia *in furtherance* of the drug conspiracy. There is no doubt that members of the conspiracy had access to guns and guns were carried, but in order for a 10-year consecutive sentence to be imposed, the Government must prove through clear and convincing evidence that the brandishing or discharge of any weapons was *in furtherance* of the conspiracy and not out of generic hooliganism, anger, one ups-manship, or foolhardiness.

For this reason, Counsel asks the court find the government failed to prove that guns were brandished or discharged *in furtherance*, and impose a five-year, consecutive sentence to the 10-year minimum mandatory sentence on the drug charge.

## II.    Johnny Garcia Has a Tragic History, Is a Young Man, and Can Be Reformed

*Difficult Childhood, Learning Disabilities and Poverty:*

Johnny was born in the Dominican Republic to a young mother with no financial means who had been sexually abused. For part of his young life, they were homeless and subject to sleeping wherever they could find room, sometimes sitting up. When they had meager shelter, it was often without toilet facilities and subject to extremes of temperature.

During the years he attended school he had difficulty learning and sitting still. Because of the family's poverty, they were not able to afford to have him tested for cognitive deficits and consequently Johnny remained untreated for potential learning disabilities.[3]

---

[3] The facts regarding Johnny's personal background recited herein are discussed at length in a detailed forensic/psychological evaluation prepared by Dr. Liliana Rusansky Drob, Psy. D., Clinical and Forensic Psychologist, available for the Court's review upon request, and originally undertaken following Johnny's attempts to commit suicide while incarcerated.

As a child he also suffered a variety of health issues including psoriasis, allergies, bronchopneumonia, and intestinal infections which caused him difficulty eating. At age three, his skin turned black and he was hospitalized for a month. At age five he contracted tetanus and at age eight, meningitis.

He was small in stature and weight and often picked on by peers and older boys. The family (comprised of Johnny, his mother and sister) had few resources, clothes or food. At a point in his early pre-teens, Johnny was sexually molested by older boys. He carried these scars into later years and became a young adult dependent on the approval and opinions of his friends. He wanted to be looked up to and considered a man.

*Transfer at Critical Developmental Age to the U.S. and Abusive Father*

At age 14, he moved to the United States to begin living with his father who he barely knew. Because he was fragile, emotionally and physically, (he slept in the same bed as his mother until age 13), the sudden transplant to this country, where he didn't speak the language, had no friends and was thrust into living with a different family (the father had a new wife and children), was traumatizing. He did poorly in school and found it difficult to sit still. (Dr. Drob believes Johnny suffered from undiagnosed ADHD as well as other psychiatric illnesses including depression.[4]) (He had been institutionalized in the Dominican Republic at age seven for a disorder he cannot recall.) Johnny has continued to need psychiatric care after being imprisoned in January 2010, and is currently prescribed both anti-anxiety and anti-depression medication.

Johnny described his father as demanding and abusive. Johnny's mother, in her letter to the court, called the father "a drunk and a drug addict," who mistreated Johnny and frequently

---

[4] Children with untreated ADHD often suffer from low self-esteem and many of them turn to drugs as a form of self-medication.

punished the children for no reason. Johnny felt his father treated him differently than his

children with his new wife, providing Johnny few clothes and often hitting him in public.

Worse, Johnny's father used violence to reprimand Johnny's closest sibling, Johniris. (While

Johniris denied this abuse to probation when interviewed, she admitted it to counsel and stated

she was afraid to tell the truth to probation because she knew they would be speaking to her

father and feared further repercussions.)

In Ninth grade, Johnny attended Bronx International High School and was placed in Special

Education courses. He found it difficult to concentrate and was labeled 'impulsive.' Again, his

probable ADHD was not diagnosed or treated.

His relationship with his father worsened. Often Johnny intervened when his sister was hit. At

one point when Johniris became pregnant, Johnny insisted his father permit her to remain in the

U.S. so that the child could be American. Instead the father sent her back to the Dominican

Republic, where the child was born and still lives, while Johniris returned to the U.S. Ultimately

these differences led him to leaving his father's home.

Johnny and Johniris moved in with their uncle, Silvio Garcia Rosa; but with nine people living

in a two-bedroom apartment, and the continued beatings by Johnny's father when he came to

visit, Johnny soon left and began living in the street, on subways and with friends. He found

work throughout this period in various part-time jobs including washing and parking cars, at

McDonalds, as a mechanic, and in construction.

*Need to Belong*

Johnny knew his co-defendants from the street and looked up to Javier Lopez ("Twin") in

particular. They became a group of orphan kids—all of approximately the same young age who,

for various reasons, left their homes, or had no homes, and sought the comfort of each other for company and protection.

*The Real Leader of 1151 Elder was "Twin"*

While it is the government's contention that Johnny was a co-leader in the conspiracy, evidence shows the opposite. All of the government's three witnesses described Twin as the leader. He organized the workers, procured the drugs, managed their packaging, collected the monies at the end of shifts and re-upped on supplies from his own sister.

Tellingly, when Johnny was put in jail on Jan. 4th, 2010, Twin's drug-selling business didn't miss a beat. The others, without Johnny, moved from the apartment at 1151 Elder and began operating elsewhere obtaining additional weapons, drugs and clientele. (Of the drug sales caught on video, all relate to this period *after* Johnny left the conspiracy.)

If Johnny was truly the co-leader of the group, it is illogical to believe the conspiracy could have re-grouped so quickly and flawlessly in his absence.

While Twin and Johnny were friends, Johnny was not seen selling drugs by witnesses except Vasquez, and the one proved act of weapon's discharge in furtherance of the conspiracy—the shooting of Christopher Torres, a rival drug seller, was ordered by Twin, *after* Johnny was already in jail. Johnny had nothing to do with this shooting.

Twin did not need Johnny to co-manage the organization and the putative proof of it presented at trial-- the generalizations of cooperators who alternately referred to Johnny as just another member of the crew and as the co-leader-- belies the government's contention that he was a co-manager. (It's interesting to note that Christopher Torres, "Jon Jon," referred to himself in testimony as only a 'worker', while word in the street and from the other co-operating witness, Eddie Velez, was that Torres was a 'manager.' ["Jon Jon basically took care of everything."

11

Velez testimony, p.469, line 10.] This point illustrates that perceptions of people's roles in drug organizations are not always accurate, and where the number of additional years a young man must serve in jail rides on such a determination, it is imperative the government prove their position with more empirical evidence than the hearsay of cooperators.

During trial testimony it was also revealed that Twin shot at another witness- Eddie Velez (Velez testimony, p. 452), in April, 2010, after Johnny was in jail. Twin clearly was the mastermind behind the "Elder Street Gang" and played more of a hands-on role. Although he pleaded guilty in this case almost a full year ago, he is yet to be sentenced. Whatever sentence the court determines is just for Johnny should be less severe than what it issues Twin. Twin clearly headed the organization both before and after Johnny's incarceration, fired shots at Velez, and ordered the murder of a man, Christopher Torres. (Thankfully, Torres was only injured.) In that the court must consider the comparative sentencing of others in the conspiracy, counsel respectfully submits that because Johnny's role was lesser than Twin's, he should be sentenced to a lesser term of incarceration.

### III. Defendant Challenges the Following Points in the Pre-Sentence Report

In referencing alleged acts of firearm discharge by Johnny, defendant denies running down Wheeler Avenue, firing at the Wheeler Boys. (PSR, p.6, graph 27). He further denies being with Carlos Carrera when Carrera shot Sean Daniels, "the gay guy." (p.6, graphs 28, 29.)

The shooting incident referred to in graph 30, page 6, had nothing to do with drug trafficking and arose from a dispute among the women and their relationship with Johnny.

Graph 46, p.8, incorrectly states that Johnny was arrested on May 5, 2010. Johnny was arrested on January 5, 2010, and was imprisoned (either in State or Federal custody) since that time.

In terms of Victim Impact, p. 8, no one was hurt in any alleged shooting on Wheeler Avenue, graph 49.

In the Dec. 2009 incident, Natalie Santana suffered a superficial wound for which she refused hospital treatment, graph 50.

Johnny denies ever making threatening comments to co-defendants about the cooperating witness and counsel urges the court to be skeptical about the truth of this allegation. Kelvin Vasquez, the primary cooperator who stood to gain or lose the most from his testimony, never told prosecutors such threats were made until significant time passed after the alleged threats were made. The threats allegedly occurred in the courthouse holding cells on the August 30th court adjourn date. Yet, when Vasquez met with prosecutors in a proffer session on Oct. 14, 2011, he failed to mention the supposed threats. Not until a subsequent meeting in November 2011, were the alleged threats mentioned. (Tr. 148-149.) Clearly had the threat occurred in August, Vasquez or his attorney would have immediately, or at the very least, at the very next proffer session, told prosecutors.

Most of the information in the PSR is cumulative in that it relates to events of all the co-defendants, many of which occurred either without Johnny's participation or after he was incarcerated and, therefore, no longer a part of the conspiracy. (See graphs 21-26; 31-36; 3-42.) Defense counsel reminds the court that all of the video-taped buys conducted from January through April occurred after Johnny was in jail.

In terms of the Offense Level Computation counsel objects to the base level attributed by the government—at least 2.8 kilos but less than 8.4 kilos for crack.  The jury, after being asked to determine what amount of drugs was sold, determined that more than 280 grams of crack was involved in the conspiracy.

It is counsel's position that insufficient evidence was produced to justify the amount probation claims-- between 2.8 and 8.4 kilos.

According to the Government's witness, Kelvin Vasquez, (the only witness who testified to being part of the Elder Street gang), in the five months he was involved in the conspiracy, the group sold approximately 80 to 90 grams of crack every week to 10 days. (Tr. p. 26, line 15 et seq. to p. 50.)  Assuming 90 grams of crack were sold every 10 days over a five-month period (150 days), the gram total would be 1,350 grams sold. (1.35Kilos)(90 times 15).  This amount brings the guidelines to a level 34 instead of 36.  (2D2.1(c)(3)[More than 840 grams and less that 2.8 kilos.]  It's uncertain whether the five months Vasquez testified to include the period Johnny was incarcerated.  Vasquez was not arrested until April, 2010, while Johnny was arrested in January. Assuming the period included four of the five months Johnny was in jail (and thus out of the conspiracy), the weight amount should be even lower.

Johnny denies being an organizer or leader of the offense (see all arguments above), and therefore disputes adding an additional 4 points for this alleged conduct. (graph 59). This also impacts graph 57—"using a person less than 18 years of age."  This enhancement only applies if Johnny is assigned an "aggravating role" (such as organizer or leader of the criminal activity), challenged in the paragraph above.

Finally, because he made no threatening comments while in the cell block awaiting a court appearance, he should not be assessed the additional two points here. (graph 60)

## IV. Johnny Suffers Psychological Disabilities; Has Strong Family Support and Can Be Rehabilitated

Results of the forensic psychological evaluation done on October 30th, 2011, following Johnny's second suicide attempt, conclude that Johnny was at high-risk for developing anti-social behaviors due to a combination of his learning disabilities, hyperactivity, violence at home, and physical ailments.[5]  The trauma he suffered in being estranged from his mother (who now lives in Argentina and works in a Laundromat) cannot be underestimated.

He bounced between families and countries, never getting the attention he needed for his cognitive deficits and psychological problems. Following testing by Dr. Drob, it was determined that Johnny's IQ is 75, "the lowest fifth percentile in comparison to similarly-aged peers, and representative of Borderline range of intellectual functioning."

In particular his score of 67 on the Perceptual Reasoning Index is deficient and is "suggestive of serious deficits in the capacities for perceptual organization and non-verbal reasoning." "Taken together, the defendant's poor performance on the Perceptual Reasoning and Working Memory Indices are suggestive of a significant learning disability that likely impacted negatively on Mr. Garcia's academic performance and helps explain his failure to achieve master in English despite having been in the U.S. since age 13."[6] This also suggests deficits in non-verbal reasoning and impulse control.

Drob concluded that Johnny developed a "defensive narcissism" as a means of coping with his poor self-image and a vulnerability to being manipulated by those around him.

In her conclusion she writes that "Mr. Garcia is a cognitively, emotionally and socially impaired 19-year-old." The interesting contrast about his testing is that he tested high in verbal

---

[5] Drob report.
[6] Drob report.

comprehension and processing speed leading her to conclude that, in the proper circumstances, he could eventually "find a productive and gratifying occupation and future."

Johnny's family supports him in spite of his errors. He is loved by many and, in turn, loves his family deeply. In letters attached to this report, Johnny is noted to be 'loving, friendly and tender." (His sister, Johniris.) His friends and family uniformly note that he is hard-working, but "still a boy without much experience." (Grandmother, Melania Nunez-Diaz.) His cousins, aunts and grandmother in the Dominican Republic miss him, and write the court that they love Johnny dearly, and beg for leniency.

Johnny has a child who he helped take care of when out of jail and provided support. He looks forward to someday reuniting with his child and returning to work as a mechanic.

While in jail he completed a drug-dependency class as well as a parenting course. Although he spent time in the Segregated Housing Unit (SHU), these occasions most often arose in the context of adapting to life in prison, particularly as a small statured, younger man confronted with men older, bigger and stronger.

*Credit for the time he spent in State Prison*

When Johnny was first arrested in January, 2010, he spent eight months in Riker's Island awaiting trial on a gun possession charge—the same guns the Government used to prove its case here. Ultimately he was found guilty and sentenced to five years jail. Johnny is just "on loan" to the federal system and is presently serving his state jail sentence even though currently in federal custody. This seems unfair. Because of the vagaries of being tried first by State court and not Federal authorities, Johnny cannot get credit for the two years he spent in State custody. (Had he been tried in Federal Court first, it's unlikely State would have prosecuted him at all.)

He suffers from psychological ailments that include depression, anxiety and ADHD and has already tried to kill himself twice.

In spite of the crimes he was convicted of committed, this counsel has always found him to be a considerate, respectful young man, who's been a pleasure to work for and with.

For a young man who just turned 21, the amount of time probation recommends (30 years) is extraordinary and excessive. (More than the amount of time he's been alive so far.)  While Johnny was convicted of possessing weapons and selling narcotics, evidence showed he injured no one (except for a superficial wound to Natalie Santana's leg,) and played a less violent role than others in the conspiracy.

For all of these reasons, counsel urges the court impose the minimum mandatory sentence, whatever it finds that to be depending on whether it finds Johnny "brandished" or "discharged" a weapon *in furtherance* of the conspiracy.  A sentence within this range would be stiff, achieve the aims of sentencing in punishing Johnny and maintaining public confidence in the law, yet permit Johnny to return to his family while he is still able to carve out a life and find employment.

Respectfully Submitted,


Toni Messina, Esq.
Attorney for Johnny Nunez-Garcia


CC:  Ryan Pascablo, AUSA; Michael Ferrara, AUSA

18