UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

          - v. -                  :          S3 10 Cr. 367 (TPG)

JOHNNY NUNEZ GARCIA,              :

               Defendant.        :

- - - - - - - - - - - - - - - x




GOVERNMENT'S SENTENCING MEMORANDUM OF LAW




                         PREET BHARARA
                         United States Attorney for the
                         Southern District of New York,
                         Attorney for the United States
                            of America



Michael Ferrara
Ryan P. Poscablo
Assistant United States Attorneys
     - Of Counsel -

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA          :

    - v. -                          :          **SENTENCING SUBMISSION**

JOHNNY NUNEZ GARCIA,              :          S3 10 Cr. 367 (TPG)

         Defendant.              :

- - - - - - - - - - - - - - - - x

## GOVERNMENT'S RESPONSE TO DEFENDANT'S SENTENCING LETTER

       The United States of America, by its attorney, Preet Bharara, United States Attorney for the Southern District of New York, Michael Ferrara and Ryan P. Poscablo, Assistant United States Attorneys, of counsel, respectfully submits this response to defendant Johnny Nunez Garcia's December 5, 2012 sentencing letter in advance of the January 9, 2013 sentencing.  The Government respectfully requests that the Court impose a term of incarceration within the advisory Guidelines range of life imprisonment for Count One to be followed by a mandatory 120 months' imprisonment for Count Two.

       Garcia's sentencing memorandum requests that he be sentenced to 120 months' imprisonment for Count One to be followed by 60 months' imprisonment for Count Two.  Specifically, contrary to the abundant evidence presented at trial, Garcia argues that the Government presented no evidence to show that Garcia brandished or discharged a firearm in furtherance of the

2

drug conspiracy charged in Count One.  As the Court is aware, the Government presented abundant proof that Garcia discharged a firearm in furtherance of the drug conspiracy.  Accordingly, as to Count Two, the Government respectfully submits that the Court should sentence Garcia to 120 months' imprisonment for Count Two, which is to be served consecutive to Garcia's sentence of imprisonment for Count One.

The Government submits that a sentence within the advisory Guidelines range of life imprisonment for Count One, to be followed by 120 months' imprisonment for Count Two, would be sufficient, but not greater than necessary, to account for the factors set forth at 18 U.S.C. § 3553(a).  A sentence within this range is appropriate given Garcia's role in this large-scale crack-distribution organization that sold significant quantities of crack cocaine to addicts on Elder Avenue in the Bronx, as well as for the numerous acts of violence perpetuated by Garcia in furtherance of his drug trade.

## BACKGROUND

### A.   The Offense Conduct

Garcia's arrest arose from an extensive investigation, conducted by the New York City Police Department, Major Case Unit ("NYPD") into a violent drug-trafficking organization that controlled the majority of a block of Elder Avenue.  Many of the organization's members were members of a gang called "Dominicans

3

Don't Play" or "DDP," and the DDP gang used intimidation, threats
of violence, and acts of violence to control its territory.  For
example, Garcia's crew had a rivalry with a drug crew that
operated one block from Elder Avenue on Wheeler Avenue.  Members
of that gang called themselves "The Wheeler Bopyz."

The investigation, which included several purchases of
crack cocaine by undercover NYPD detectives ("UCs"), revealed
that various members of Garcia's crew sold large quantities of
crack cocaine in small, $10 quantities called "dime bags," to
addicts 24 hours a day, seven days a week.

Garcia was without question a leader of the drug-
trafficking crew, leading the organization with co-defendant
Javier Lopez.  Garcia also played another important role:  that
of enforcer.  It was in this role that Garcia inflicted the most
harm to rival drug dealers and to innocent bystanders.  His
participation in numerous acts of violence was adequately proven
at trial.

In or about December 21, 2011, Garcia and his co-
conspirators were charged with conspiring to distribute and
possess with intent to distribute 280 grams and more of crack
cocaine, in violation of Title 21, United States Code, Sections
812, 841(a), 841(b)(1)(A), and 846.  In addition, Garcia was
charged with discharging or aiding and abetting the discharge of

firearms in furtherance of his drug trafficking, in violation of 18 U.S.C. § 924(c)(1)(A)(iii).

**B.**   **The Trial**

Garcia's trial commenced on January 17, 2012 and lasted through January 24, 2012. The Government presented abundant evidence of Garcia's participation in the drug conspiracy and the amount of drugs sold by Garcia and his co-conspirators. The Government presented evidence of numerous undercover purchases of crack cocaine from Garcia's crew (Tr. 519-524, Gov't Exs. 301-02, 404A-404E, 404G-404U), as well as evidence seized from Garcia's stash house, which included crack cocaine (Gov't Ex. 408H) and various paraphernalia, including tweezers, razor blades, digital scales, and packaging materials (Gov't Exs. 408I-13 to 408I-15).

The Government also presented the testimony of Kelvin Vasquez, who testified that Garcia and his crew, of which Vasquez was a member, sold approximately 90 grams of crack cocaine every two weeks. (Tr. 50). Over the course of the five months he participated in the conspiracy, Vasquez testified that the crew sold several hundred grams of crack cocaine. (Id.). Vasquez also testified that Garcia's crew had been selling crack before Vasquez himself began selling with the crew in October 2009. (Tr. 43). That testimony comports with Velez's testimony. Velez testified that when he was selling for a rival drug crew on Elder Avenue, Garcia was also involved selling crack on that block, at

5

least as early as mid-2008.  (Tr. 423, 426-33).  The jury was therefore entitled to infer that Garcia's crack crew operated as described by Vasquez at least as early as 2008.

Likewise, the Government's evidence of Garcia's possession and discharge of firearms in furtherance of his drug conspiracy was equally significant.  First, the Government seized four firearms kept in Garcia's stash house, including a shotgun, a machine gun, a nine-millimeter handgun and a .22-caliber Ruger. (Gov't Exs. 400-403).  In addition to the firearms, numerous rounds of ammunition were seized.  (Gov't Ex. 408J).

In addition to that physical evidence, the Government also presented the testimony of three cooperating witnesses. Vasquez testified that the purpose of the firearms was to protect Garcia's and his drug business because the crew had problems with rival drug dealers, including the crack-crew on Wheeler Avenue (Tr. 66, 77).  Significantly, the Government's evidence detailed numerous incidents in which Garcia was directly involved in the discharge of a firearm in furtherance of the charged drug conspiracy, including (1) a July 22, 2009 shooting of an individual from 1160 Wheeler Avenue; (2) at least two shootings at Christopher Torres -- a rival drug dealer who was a member of The Wheeler Boyz -- once during the summer of 2009, and another in front of 1140 Wheeler Avenue; and (3) the shooting of Natalie Santana on December 21, 2009 in front of 1151 Elder Avenue.  As

6

discussed below, the evidence offered by the Government in support of each of these incidents was credible and corroborated.

In support of the July 22, 2009 shooting of an individual from 1160 Wheeler Avenue, for example, the Government offered, in addition to Vasquez's testimony, the testimony of NYPD Detective Andre Ross, and cooperating witnesses Eddie Velez and Christopher Torres. Vasquez testified that Garcia told him that Garcia and co-conspirator Mario Carrera had gone behind 1151 Elder and fired shots at an individual from Wheeler. (Tr. 97-98). Vasquez testified that Garcia told him that Carrera had fired the gun, but that Garcia had accompanied him. (Tr. 97-98). Vasquez further testified that Garcia told him that the victim "was hit with a number of the shots." (Tr. 98).

Velez corroborated Vasquez's testimony about the shooting, testifying that he heard the gunshots that night because his back window was adjacent to the victim's back window. (Tr. 435). Velez testified that after he heard the shots, he dropped to the ground. (Tr. 435). Moments later, he stood up, looked outside his window, and saw Garcia and another individual standing there. (Tr. 435). Velez further testified that Garcia "had something in his hand -- I don't know exactly what it was -- because he [Garcia] put it on the fence to get over." (Tr. 438).

Torres also testified about this shooting. (Tr. 251-55). He testified that he heard the gunshots that evening and

7

that he ran outside to see what had happened.  (Tr. 251-53).
Torres also testified that he had seen the victim before and knew
him to live in 1160 Wheeler Avenue, Apartment 1R.  (Tr. 251-252).
Though Torres testified that the victim did not sell drugs and
was not a member of a drug crew (Tr. 252), the jury was entitled
to infer that Garcia had fired into the apartment in the hope of
hitting a member of The Wheeler Boyz, or in the mistaken belief
that the victim was a member of that rival drug gang.

  Garcia's argument that this shooting "could have just
as reasonably been based on gay bashing" is laughable, as it is
completely unsupported by the evidence and, moreover, wrongly
asks the Court to draw inferences in Garcia's favor when in fact
the Court must draw all inferences in favor of the verdict.
E.g., United States v. Sabhnani, 599 F.3d 215, 241 (2d Cir. 2010)
(holding that the Court must "view the evidence in the light most
favorable to the government, crediting every inference that could
have been drawn in the government's favor, and deferring to the
jury's assessment of witness credibility and its assessment of
the weight of the evidence." (internal quotation marks omitted)).

  The evidence presented to the jury showed that members
of Garcia's crew fired with impunity at people they perceived to
be rival dealers, including members of The Wheeler Boyz.  There
was also evidence that at least two known drug rivals, Velez and
Torres, lived near where the victim was shot.  Indeed, Velez

testified that his back window was adjacent to the victim's window.  The jury was therefore free to infer that Garcia shot the victim on Wheeler Avenue because Garcia believed the victim was a drug dealer, that Garcia hoped to hit a rival drug dealer, or that Garcia hoped to hit Velez, who sold crack for The Wheeler Boyz.

        The evidence also showed that Garcia shot at Torres on at least two occasions:  (1) during the summer of 2009 near the corner of Wheeler and Westchester Avenues, and (2) in front of 1140 Wheeler Avenue.  (Tr. 241-244).  Torres provided the only testimony about those events, but his testimony was clear and concise, and the jury was entitled to credit it.  Torres did not stretch the truth in his testimony.  His recollection of the events involving Garcia on these two occasions were specific, detailed, and, although not supported by any police reports, credible in light of the surrounding testimony concerning Garcia's penchant for firing his weapons at rivals.

        Lastly, the evidence showed that Garcia discharged a firearm in the direction of several women who had begun an argument in front of his drug spot, hitting a victim, Natalie Santana.  Vasquez credibly testified that Garcia shot at the women because the women were "heating up the spot."  (Tr. 82-85)  Vasquez testified that he understood this to mean that "if the police see that there is trouble, if they come and see that

9

something has happened, then you can't sell drugs anymore and that's what heating up the spot means." (Tr. 85). That the initial argument that brought, and kept, the women there was not drug related is of no consequence. The evidence showed that Garcia fired his weapon at the women in order to get them to leave, because their presence could potentially affect Garcia's ability to sell drugs by drawing the attention of law enforcement. Furthermore, although Garcia's contention that he fired the weapon "as an impulsive act of anger" may be true, that does not, in any way, disprove the evidence offered by the Government that Garcia fired his gun because he wanted the women, who were "heating up his drug spot," to leave. By doing so, it is without question that he discharged that firearm in furtherance of his drug conspiracy.

## C.   **The Presentence Investigation Report**

On March 13, 2012, the Probation Office issued its Presentence Investigation Report ("PSR") in this case. The PSR determined that the base offense level was 36, as Garcia conspired to distribute at least 2.8 kilograms but less than 8.4 kilograms of crack cocaine. (PSR ¶ 56). The PSR added two levels because Garcia employed minors in the crack conspiracy. (PSR ¶ 57). The PSR also applied a four-level enhancement because Garcia was an organizer or leader of a crack crew that involved five or more participants. (PSR ¶ 59). Finally, as

10

Garcia threatened his co-defendants not to testify against him, the PSR added two levels for obstruction.  (PSR ¶ 60).  The PSR further concluded that Garcia was in Criminal History Category III.  (PSR ¶¶ 67-87).

The Probation Office therefore concluded that the advisory guidelines range was life imprisonment as to Count One and 120 months' imprisonment as to Count Two, with a mandatory minimum term of 10 years to run consecutively to one another. (PSR ¶¶ 158-59).  The Probation Office recommended a sentence of 240 months' imprisonment on Count One and 120 months on Count Two, to run consecutively to each other, as required by law, for a total term of imprisonment of 360 months, followed by a five-year term of supervised release, no fine, and a $100 special assessment.  (PSR at 27.)

## ARGUMENT

### A.   The Governing Legal Framework for Sentencing

The Guidelines still provide strong guidance to the Court in light of United States v. Booker, 543 U.S. 220 (2005) and United States v. Crosby, 397 F.3d 103 (2d Cir. 2005). Although Booker held that the Guidelines are no longer mandatory, it held also that the Guidelines remain in place and that district courts must "consult" the Guidelines and "take them into account" when sentencing.  543 U.S. at 264.  As the Supreme Court has stated, "a district court should begin all sentencing

11

proceedings by correctly calculating the applicable Guidelines range" -- that "should be the starting point and the initial benchmark." <u>Gall v. United States</u>, 55 U.S. 38, 49 (2007).

After that calculation, however, a sentencing judge must consider seven factors outlined in 18 U.S.C. § 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, <u>id.</u> § 3553(a)(2); "the kinds of sentences available," <u>id.</u> § 3553(a)(3); the Guidelines range itself, <u>id.</u> § 3553(a)(4); any relevant policy statement by the Sentencing Commission, <u>id.</u> § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," <u>id.</u> § 3553(a)(6); and "the need to provide restitution to any victims," <u>id.</u> § 3553(a)(7). In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

> (A)  to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> (B)  to afford adequate deterrence to criminal conduct;
> (C)  to protect the public from further crimes of the defendant; and
> (D)  to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

<u>Id.</u> § 3553(a)(2).

Courts may not presume that the appropriate sentence necessarily lies within Guidelines range, but "the fact that § 3553(a) explicitly directs sentencing courts to consider the Guidelines supports the premise that district courts must begin their analysis with the Guidelines and remain cognizant of them throughout the sentencing process."  Gall, 552 U.S. at 50 n.6. Their relevance throughout the sentencing process stems in part from the fact that, while the Guidelines are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," Rita v. United States, 551 U.S. 338, 348 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," Gall, 552 U.S. at 46; see also Rita, 551 U.S. at 349.  To the extent a sentencing court varies from the Guidelines sentence, "[it] must consider the extent of the deviation and ensure that the justification is sufficiently compelling to support the degree of the variance."  Gall, 552 U.S. at 50.

**B.  The Court Should Impose a Sentence Within the Range of Life Imprisonment To Be Followed By 120 Months' Imprisonment**

Here, a sentence within the advisory Guidelines range of life plus 120 months imprisonment would be sufficient, but not greater than necessary, to comply with the purposes of sentencing.  From a categorical perspective, the Guidelines

13

reflect the considered judgment of the Sentencing Commission, after examining "tens of thousands of sentences and work[ing] with the help of many others in the law enforcement community over a long period of time" in an effort to fulfill the same objectives set out in Section 3553(a). <u>Rita</u>, 551 U.S. at 349. The Guidelines "seek to embody the § 3553(a) considerations, both in principle and in practice," and accordingly, the Guidelines "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." <u>Id.</u>

From an individual perspective, consideration of several of the § 3553(a) factors, in addition to the advisory Guidelines, also warrants a period of incarceration of life imprisonment. The § 3553(a) factors most applicable in this case include the nature and circumstances of the offense, the seriousness of the offense, the need to provide just punishment, the need to promote respect for the law, the need to afford adequate deterrence to criminal conduct, and the advisory Guidelines range of life imprisonment to be followed by a term of 120 months' imprisonment.

1. **The Nature and Seriousness of the Offense**

Perhaps the most fundamental and logical of the § 3553(a) factors is the "nature and circumstances of the offense." 18 U.S.C. § 3553(a)(1). By selling crack cocaine day after day to addicts, many of whom have children and families,

14

Garcia engaged in conduct that poses a great danger to American society.  Garcia compounded that danger by engaging in gunplay and other acts of violence.  As set forth above, there was vivid trial testimony regarding Garcia's use of weapons, including his shooting two completely innocent individuals.  Moreover, the Court saw the weaponry that Garcia maintained in his stash apartment.  In addition to multiple handguns, Garcia and his crew had a shotgun and a machinegun.  (E.g., Tr. 69; GX 400-01). Obviously, considering the overall conspiracy that Garcia participated in, and the violence he engaged in, the "nature and circumstances" of the instant offense are extremely serious.

> ### 2.    The Need to Promote Respect for the Law, and the Need to Afford Adequate Deterrence

A term of imprisonment within the Guidelines range also is appropriate to promote respect for the law and to provide both specific deterrence to Garcia and general deterrence to others. Indeed, considering Garcia's actions took place over the course of many months, a sentence within the applicable Guidelines range promotes respect for the law and will deter Garcia from engaging in this conduct in the future.  As the PSR notes, until now, Garcia has been undeterred by prior convictions (PSR at 28), and has shown a remarkable lack of respect for the law.  Therefore, a sentence within the Guidelines range would promote much needed respect for the law and afford specific deterrence to Garcia.

Finally, as a general matter, the sentence should provide deterrence for others who may consider selling crack cocaine to make money, and shooting people and resorting to violence to protect and foster that illicit business.

### 3.   **Similarly Situated Defendants**

On November 16, 2011, the Honorable Lewis A. Kaplan, United States District Judge, sentenced defendant Saikou Diallo, a/k/a "Jalo," to 420 months' imprisonment for Diallo's role as the leader of a faction of The Wheeler Boyz gang.  <u>United States v. Diallo</u>, S3 11 Cr. 59 (LAK).  Like Garcia, Diallo ran a crew that sold crack cocaine on and around Wheeler Avenue (one block from Garcia's Elder Avenue) in the Bronx, New York.

As discussed above, The Wheeler Boyz violently feuded with Garcia's crew.  Like Garcia, Diallo engaged in gunplay and other acts of violence, including shooting at rival drug dealers. Unlike Garcia, Diallo did not successfully shoot anyone, much less two innocent people.

Diallo was charged convicted of two counts of conspiracy to distribute crack cocaine (Counts One and Three) -- one of which was a conspiracy to distribute 280 grams and more of crack cocaine -- and discharging a firearm in furtherance of one of those conspiracies (Count Six).  Judge Kaplan sentenced Diallo to concurrent terms of imprisonment of 240 months on each of Counts One and Three, to run consecutively to a term of

16

imprisonment of 180 months on Count Six, for a total of 420 months' imprisonment.

## CONCLUSION

For the reasons set forth above, the Government respectfully submits that the Court should impose a sentence of life imprisonment for Count One to be followed by 120 months' imprisonment for Count Two.

Dated: New York, New York
        January 8, 2013

                          Respectfully submitted,

                          PREET BHARARA
                          United States Attorney
                          Southern District of New York


                    By:   /s/ MICHAEL FERRARA
                          RYAN P. POSCABLO
                          MICHAEL FERRARA
                          Assistant U.S. Attorneys
                          212-637-2634 / -2526

cc:  Toni Messina, Esq. (By ECF)